RENDERED: NOVEMBER 18, 2010
TO BE PUBLISHED

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$

2008-SC-000781-DG

KENTUCKY FARM BUREAU MUTUAL                                APPELLANT
INSURANCE COMPANY


                    ON REVIEW FROM COURT OF APPEALS
V.          CASE NOS. 2007-CA-001078-MR; 2007-CA-001132-MR
                MONTGOMERY CIRCUIT COURT NO. 06-CI-90203


SHELTER MUTUAL INSURANCE COMPANY                          APPELLEE


                **OPINION OF THE COURT BY JUSTICE SCOTT**

                              **REVERSING**

                          **I. Introduction**

This is an appeal from an opinion of the Court of Appeals reversing the

Montgomery Circuit Court, which had imposed primary liability for a motor

vehicle accident on the vehicle's and vehicle owner's insurer, rather than on the

insurer of the permissive driver. Neither policy was for a business or

commercial coverage.

After paying the damages, the vehicle's and vehicle owner's insurer,

Shelter Mutual Insurance Company (Shelter), filed a declaratory judgment

action and subsequent motion for summary judgment against Kentucky Farm

Bureau Mutual Insurance Company (Farm Bureau), the permissive driver's

insurer, seeking to recover a pro-rata allocation of the damages between it and

Farm Bureau. Farm Bureau filed a cross-motion for summary judgment asserting Shelter's primary liability as the primary insurer of the vehicle and thus, Farm Bureau, with its "excess insurance clause," would be an excess carrier only.

The trial court granted Farm Bureau's cross-motion for summary judgment, holding Shelter liable for the damages. It did not, however, detail its findings or reasoning in its summary judgment order. The Court of Appeals subsequently reversed, finding—as contended by Shelter—that each of the insurers' policies contained "mutually repugnant" excess insurance clauses,[1] and thus prorated the damages between the insurers.

Because we find that Shelter, the vehicle's and vehicle owner's insurer, was the primary insurer as mandated by the spirit and intent of the Kentucky Motor Vehicle Reparations Act (MVRA), KRS 304.39-010, *et. seq.*, we hold that the Court of Appeals erred when it reversed the Montgomery Circuit Court and prorated the damages. We, therefore, reverse the decision of the Court of Appeals and reinstate the decision of the trial court.

---

[1] "In substance, [an excess clause] provide[s] that in the case of a loss . . . the policy would be excess insurance over any other valid and collectible insurance." *Government Emp. Ins. Co. v. Globe Indem. Co.*, 415 S.W.2d 581, 581 (Ky. 1967). (internal citations omitted). Compare this with a standard escape clause, which "in most instances . . . negat[es] any liability if 'other valid and collectible insurance' is available to the driver." *Id.* at 582. On the other hand, a pro-rata clause "provides that if more than one policy applies, the insurer is responsible only for that percent of the total sum payable that the limit of liability of the coverage bears to the total limits of liability under that coverage for all the policies." Robert D. Monfort, *Kentucky Motor Vehicle Insurance Law* §10.2 (2d ed. 1996).

## II. Background

This case stems from a two-car accident in which Farm Bureau insured Kevin Watkins (Kevin), the non-owner, but permissive driver, of the vehicle, while Shelter insured the vehicle through the owner's policy, and, thus, the permissive driver. Although insured by Farm Bureau under his own separate policy on his vehicle, Kevin was driving his parents' vehicle when he negligently collided with another vehicle, causing injuries. Shelter was the insurer for the parents' vehicle, while Farm Bureau insured Kevin personally.

The issue then is which of the companies—Farm Bureau insuring the non-owner driver and Shelter insuring the vehicle, owner, and permissive driver—is liable and therefore obligated to pay the damages. The complication arises because each of the two policies arguably contains an "excess insurance clause" purporting only to provide coverage in excess of the other's coverage.[2] Thus, normally we would be called on to determine which policy, if any, is primary and which is excess, or if both are excess and mutually repugnant, how the damages should be pro-rated between them.

In acknowledging the importance of the questions presented, we are aware of Shelter's assertion in its brief to the Court of Appeals that:

> [T]he issues presented in this case arise every time the policy forms collide. Moreover, one or more of [the] policy forms at issue in this case are used by [other] insurers, multiplying exponentially the

---

[2] The Court of Appeals found that each insurance policy had a liability limit of: $25,000 per person, $50,000 per accident for bodily injury, and $25,000 per accident for property damages. However, it is undisputed that that the injured parties' personal and property damages were less than either of these minimum policy limits, as the total amount of damages was $2,000.00 for personal injury, $2,289 for medical expenses, and $954.26 for property damage.

number of times when the competing forms collide. Thus, there is far more at stake than the amount in controversy.

In this same regard, we note Farm Bureau's concern in its brief that "[t]he issues presented by this case arise each time the terms of separate policies are at odds. The policy language at issue is used by multiple companies which causes similar issues to arise on a frequent basis, making this case of far greater significance than it may appear."

In this regard, Shelter's excess clause for its insurance on the vehicle states: "[i]f there is other insurance which covers the insured's liability with respect to a claim also covered by this policy, [liability] Coverages A and B of this policy will apply only as excess to such other insurance."

Yet, Farm Bureau's excess insurance clause (for Kevin's insurance) states: "[a]ny insurance we provide for a vehicle *you do not own* shall be excess over any other collectable insurance or self-insurance whether primary, excess or contingent."

(Emphasis added).

Notwithstanding that Farm Bureau's clause seems, at first blush, to be an "excess over excess" in that it recognizes that another competing policy may be an excess policy, but still asserts an excess position over such other excess coverage, *see Globe Indem. Co.*, 415 S.W.2d at 582, the Court of Appeals determined that both clauses evince both insurers' intention to provide only excess coverage. Hence, the Court of Appeals found the clauses mutually

4

repugnant and remanded the matter to the trial court for proration of the damages between both insurers.

However, after due consideration, we reverse the Court of Appeals, and hold that the insurer of the vehicle in this case, Shelter, had the primary coverage and was thus liable for the damages to the extent of its coverage. In so doing, we decline, in this instance, to further embroil Kentucky courts in unduly complicated two-step insurance policy interpretations of continually emerging and changing insurance avoidance clauses and the consequent burden of apportionment because such considerations are inconsistent with the policies and intent of the MVRA.[3]

### III. Analysis

We are confronted here with a scenario wherein both automobile insurance policies claim to provide only *excess* coverage. Logically, under the circumstances, both cannot be excess insurers; rather, practically and

---

[3] In so holding, we are mindful of Shelter's argument that Farm Bureau did not raise this issue in the trial court and therefore, we have no authority to address it. *Regional Jail Authority v. Tackett*, 770 S.W.2d 225 (Ky. 1989). It should be noted, however, that in *Tackett*, the Court of Appeals *reversed* the trial court via an issue that was never addressed by it. Here, the result of our opinion is to affirm the trial court. *See Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 575-76 (Ky. 2009) ("[A]n appellate court may affirm a lower court's decision on other grounds as long as the lower court reached the correct result."); *see also Fischer v. Fischer*, 197 S.W.3d 98, 102-03 (Ky. 2006) ("Appellee's failure to raise the issue . . . does not prevent Appellant from presenting it here as he had no duty to present it to the Court of Appeals since he defended the trial court decision and it had to be affirmed if it was sustainable on any basis."). Of even greater concern is that such a requirement could force this Court to affirm and publish an opinion that we know is erroneous for other reasons. *GMRI*, 299 S.W.3d at 576. Moreover, "we, as an appellate court, may affirm the trial court for any reason sustainable by the record." *Kentucky Farm Bureau Mut. Ins. Co. v. Gray*, 814 S.W.2d 928, 930 (Ky. App.1991). At any rate, in this case, the issue was presented squarely to the Court of Appeals, but implicitly rejected.

semantically, one must be primary with the other secondary (responsible for the excess), or both must be deemed to be primary.

> Indeed, there is actually no way by logic or word-sense to reconcile two such clauses, where each policy by itself can apply as a primary insurer, but where the clause in each policy nevertheless attempts to make its own liability secondary to that of any other policy issued by a similar primary insurer: For then the primary and (attempted) secondary liability of each policy chase the other through infinity, something like trying to answer the question: which came first, the chicken or the egg?

*State Farm Mutual Insurance Co. v. Travelers Insurance Co.*, 184 So.2d 750, 753-54 (La. App. 1966) (Tate, J., concurring); *see also Pioneer State Mut. Ins. Co. v. TIG Ins. Co.*, 581 N.W.2d 802 (Mich. App.1998).

And here, any contrary result would be in contravention of the spirit and intent of Kentucky's 1974 enactment of the MVRA. KRS 304.39-010, *et. seq.* In this regard, the MVRA policy and purposes section, KRS 304.39-010, states in part:

> The toll of about 20,000,000 motor vehicle accidents nationally and comparable experience in Kentucky upon the interests of victims, the public, policyholders and others require that improvements in the reparations provided for herein be adopted to effect the following purposes:
>
> . . . .
>
> (2) To provide prompt payment to victims of motor vehicle accidents without regard to whose negligence caused the accident in order to eliminate the inequities which fault-determination has created;
>
> (3) To encourage prompt medical treatment and rehabilitation of the motor vehicle accident victim by providing for prompt payment of needed medical care and rehabilitation;
>
> . . . .
>
> (5) To reduce the need to resort to bargaining and litigation through a

6

system which can pay victims of motor vehicle accidents without the delay, expense, aggravation, inconvenience, inequities and uncertainties of the liability system;

(6) To help guarantee the continued availability of motor vehicle insurance at reasonable prices by a more efficient, economical and equitable system of motor vehicle accident reparations;

(7) To create an insurance system which can more adequately be regulated; and

(8) To correct the inadequacies of the present reparation system, recognizing that it was devised and our present Constitution adopted prior to the development of the internal combustion motor vehicle.

Clearly, it would be a violation of the spirit and intent of the MVRA to allow each insurer to deny coverage based on a claimed contractual excess position, since without a primary insurer, there can be no excess. And while admittedly, Shelter paid the claim promptly in this instance, there are no guarantees that similar competing (and arguably) excess insurers will always do so in the future, further inhibiting the clear mandate of the MVRA. *See Calvert Fire Ins. Co. v. Stafford*, 437 S.W.2d 176, 177 (Ky. 1969) ("Neither of the insurance companies would pay the loss . . . ."). Thus, any contrary logic must carry with it the uncertainty and potential delays of the litigation necessary to establish—and re-establish—the priority and coverage from which reparations are to be made.

Generally, where the focus is on each insurer's competing avoidance of liability clauses, courts take a bifurcated and sometimes complicated approach, with the court examining the policies, and if the court finds them mutually repugnant, it then apportions the loss in various ways between each

insurer. *See* 7A Am. Jur. 2d *Automobile Insurance* § 573 (2010) (listing decisions from multiple state and federal courts finding clauses mutually repugnant and holding each insurer liable for a share of the loss).

## A. The Two-Step Framework

Under this approach, the court must first examine each policy. If, after examining the relevant clauses in each policy, "the two policies are indistinguishable in meaning and intent, [and] one cannot rationally choose between them [they are held] to be mutually repugnant and must be disregarded." *Travelers Indem. Co. v. Chappell*, 246 So.2d 498, 504 (Miss. 1971) (internal quotations omitted). Once found to be mutually repugnant, the trial court apportions liability between the insurers.

Once step one is resolved, and the court finds the competing clauses to be mutually repugnant, there are three primary options for pro-rata apportionment: policy limits, premiums paid, and the equal share method. *Reliance Ins. Co. v. St. Paul Surplus Lines Ins. Co.*, 753 F.2d 1288, 1291 (4th Cir. 1985). Under the policy limits approach, the court calculates the loss amount between each insurer in accordance with the maximum coverage limits of each insurance policy. *Id.* The second approach allocates the loss based on the amount of the premium paid by each insured to each insurer. *Id.* The third approach is a multi-step method, with the loss initially apportioned equally between two insurers until the lesser coverage is exhausted. *Id.*

Thereafter, the remaining loss is absorbed by the insurance company with the larger policy, up to its policy limits. *Id.*

### 1. Problems with the Two-Step Framework

Numerous problems arise, however, with the application of the two step method. At the outset, as the parties somewhat acknowledge, it encourages insurance companies to continuously draft specific clauses seeking to evade primary liability; sometimes at odds with the premium charged on the insurance required of the insured under the MVRA. In addition, the apportionment methods can be replete with difficulty and complexity—and one might opine—unfairness.

### a. The Mutually Repugnant Determination prompts Insurers to Engage in a "Drafting Battle"

The first step, determining whether the policies are "indistinguishable in meaning and intent," is a highly subjective determination. *Chappell*, 246 So.2d at 504. Thus, unless the policies in question are virtually the same, two trial courts could potentially examine the same policies and come to opposite conclusions when determining whether they are mutually repugnant. Consequently, there is a substantial risk this initial step will produce varying results. And, with the nuances in wording, there is a plethora of precedent with different results. *See Oregon Auto. Ins. Co. v. U.S. Fidelity & Guaranty*, 195 F.2d 958, 959 (9th Cir. 1952) ("These decisions point in all directions."); *see also* W. R. Habeeb, Annotation, *Apportionment of liability between automobile liability insurers where one of the policies has an "excess insurance" clause and*

9

*the other a "proportionate" or "prorata" clause*, 76 A.L.R.2d 502 (1961); C. C. Marvel, Annotation, *Apportionment of liability between liability insurers each of whose policies provides that it shall be "excess" insurance*, 69 A.L.R.2d 1122 (1960); C. C. Marvel, Annotation, *Apportionment of liability between automobile liability insurers one or more of whose policies provide against any liability if there is other insurance*, 46 A.L.R.2d 1163 (1956); *see also Aetna Ins. Co. v. State Auto. Mut. Ins. Co.*, 368 F. Supp. 1278, 1282 (W.D. Ky. 1973) ("[T]he Court realizes that this opinion represents only an educated guess as to what the Court of Appeals of Kentucky might say in a similar situation, but an educated guess is mandated under the circumstances brought about by this diversity action.").

A solution to this problem is to draft a policy so specific in nature that it *is more distinguishable* in meaning and intent than others.[4] And where successful, the insurer avoids primary liability. Thus, as a reactionary measure, each company may continuously draft and redraft provisions, seeking to avoid the mutually repugnant analysis while placing primary liability on the other company. This then leads to repetitive litigation between the old and newly emerging clauses. "Reconciling the various other-insurance clauses

---

[4] Our aversion to perpetuating a policy clause drafting battle under circumstances involving the MVRA seeks to avoid specificity arguments such as the one propounded here. Farm Bureau argues in the alternative that its non-standard excess clause's specific language and intent prevails over Shelter's general excess clause, i.e., an "excess over excess" or "super excess" clause. Farm Bureau construes our precedent, *see GEICO*, 415 S.W.2d at 582 (holding that a non-standard escape clause prevails over a general excess clause), as being the logical precursor to its proposed rule that specific excess clauses trump general excess clauses.

in automobile-liability policies has forced some courts to referee the 'battle of the draftsmen' waged by insurance companies." *Brown v. Travelers Ins. Co.*, 610 A.2d 127, 130 (R.I. 1992).

### b. Pro Rata Apportionment Problematic

The second step, appropriating the loss between the companies, presents its own set of problems with varying precedent. The inherent problems in each of the three available methods led one court to conclude, "unfortunately, no method of apportioning liability is entirely satisfactory." *Continental Cas. Co. v. Aetna Cas. and Sur. Co.*, 823 F.2d 708, 711 (2nd Cir. 1987).

The first apportionment method, proration based on the maximum policy limits, has been criticized as inequitable. *Reliance Ins. Co.*, 753 F.2d at 1291. The criticism stems from the buyer's proportionally lower additional cost to purchase insurance in excess of the minimum amount. For example, where an insured's policy limit is three times the minimum coverage level, thus tripling the insurance company's exposure in an apportionment situation, the insured has not paid triple the minimum premium amount. *See Cosmopolitan Mutual Insurance Company v. Continental Casualty Co.*, 147 A.2d 529, 534 (1959) (stating that "[i]t is commonly known that the cost of liability insurance does not increase proportionately with the policy limits.").[5]

---

[5] "In other words, the cost of insuring the first million dollars of risk may be substantially greater than the cost of insuring the second million dollars . . . . [O]nce the unit cost of a million dollars of insurance coverage has been established, the insurance companies use a factor of 1.25 in pricing $2 million of insurance; a factor of 1.4 in pricing $3 million; a factor of 1.45 in pricing $4 million; and a factor of 1.5 in pricing $5 million." *Continental Cas. Co.*, 823 F.2d at 711-712.

Furthermore, even if the loss amount is within the smaller policy limits, the larger insurance company nevertheless covers a greater segment of the loss since the calculus is based on the maximum policy limits. *See Carriers Ins. Co. v. American Policyholders' Ins. Co.*, 404 A.2d 216 (Me. 1979) (criticizing this method as apportioning a greater amount of the loss on the larger insurer regardless of the amount).

The second apportionment method, prorating based on the premiums paid, has limited practical application. At first blush, this method may seem equitable as the amount each insured pays for a premium generally correlates to the amount of the coverage provided by the insurance company. However, this method is difficult to fairly apply when the two policies in question provide different coverage. *Reliance Ins. Co.*, 753 F.2d at 1291. Many factors, aside from those used in the liability calculation, account for the premiums an insurance company charges a specific policyholder (e.g., payment history and various discounts). *Id.*

Finally, the third apportionment method, the equal share method, provides a windfall for the smaller insurer in less than policy limits damages, while in high damages situations, allocates a disproportionate share of the loss to the larger insurer.[6,7] Under this apportionment method, each insurer

---

[6] This method has also been criticized "because [the] cost [of the higher limit policy] does not increase in direct proportion to the amount of coverage," thus "apportioning liability equally [does not] accurately allocat[e] liability according to the cost of the burden each insurer contracts to carry." *Continental Cas. Co*, 823 F.2d at 712.

[7] Equal Shares Apportionment Examples: Small Insurer ($100,000 policy limit) and Large Insurer ($300,000 policy limit). Hypothetical 1: $150,000 in damages. Small

contributes matching dollar for dollar payments up to the limits of the lower policy, with the larger insurer solely responsible for any remaining portion of the loss, up to its policy limits. If, however, the damages are insufficient to exhaust the smaller policy, the two insurers both split the loss evenly.

Having analyzed the existing options for apportionment, we agree somewhat with the Second Circuit's conclusion that each of these methods of apportioning liability between insurers is somewhat unsatisfactory. *Continental Cas. Co,* 823 F.2d at 712. Furthermore, the apportionment methods can provide a windfall for the lower limit policies and unnecessarily burden the trial courts with the task of determining which factors (determining apportionment) are relevant to the analysis required.

In addition, such an analysis promotes insurance clause writing competition that rewards insurers that, through the "drafting game," successfully draft policies that avoid primary liability in these situations. And by obscuring the initial identity of the primary insurer, it promotes inefficiency in the prompt payment and treatment of vehicle accident victims, contrary to the demands of the MVRA. KRS 304.39-010(2)-(5).

Moreover, such a rule is inconsistent with our "simpler is better and less litigious" view of the spirit and intent of the MVRA as stressed in *Mitchell v. Allstate Ins. Co.,* 244 S.W.3d 59, 63 (Ky. 2008) ("[w]e believe that the . . . rule

---

Insurer and Large Insurer both contribute $75,000; Small Insurer saves $25,000. Hypothetical 2: $250,000 in damages. Small Insurer and Large Insurer both contribute $100,000, which exhausts Small Insurer's policy, thereby forcing Large Insurer to contribute an additional $50,000 to satisfy the damages amount.

13

will further the goals of KRS 304.39-010 by speeding up the process of compensating victims because determining the [issue] will no longer be as complex, or litigation prone, as it was under the [old] rule.").

## B. The Vehicle Owner's Insurance is Primary

As we have detailed above, problems proliferate at each apportionment step and with every method. Moreover, when faced with two conflicting excess clauses, many courts recognize the absurdity of finding that neither policy is primary. Thus, courts create the legal fiction that both insurers are *de facto* primary and must share the loss. And some even do it in the hopes it will *stop* the "drafting wars." *See Brown*, 610 A.2d at 130 ("[W]e do believe that ruling in full for either Metropolitan or Travelers would lend more ammunition to the battle of the drafters. We do not wish to encourage the complication of insurance legerdemain at the expense of the policy holders' money or the courts' time.").

While we recognize that the apportionment methods are an attempt at fairness and at times they must be adhered to, we can avoid the entire framework under these circumstances by refusing to perpetuate the legal fiction that both insurers are primary when the contest is between the insurer of the vehicle and the insurer of the non-owner, permissive driver. It is simply as we said in *Motorists Mut. Ins. Co. v. Glass*; "the insurer of the motor vehicle involved in the accident, [Shelter,] was the 'primary' insurer for this accident, whereas Farm Bureau was the 'excess' insurer." 996 S.W.2d 437, 442 (Ky.

14

1997). "This accords with the general rule which places primary liability on the insurer of the owner of the automobile involved rather than on the insurer of the operator, where we are dealing with the standard automobile liability policy." *U.S. Fidelity & Guaranty Co. v. Safeco Ins. Co. of America*, 522 S.W.2d 809, 821 (Mo. 1975); *see also* William J. Schermer and Irvin E. Schermer, *Automobile Liability Insurance* § 7.1 (4th ed. 2004) ("The driver of a nonowned vehicle is ordinarily afforded primary coverage under the omnibus provision of the owner's policy and excess coverage under the drive other cars provisions of his own policy.").

We recognize that the Court of Appeals, under differing factual circumstances involving commercial applications or policies, expressed a different view in *Royal-Globe Ins. Companies v. Safeco Ins. Co. of America*, 560 S.W.2d 22, 24 (Ky. App. 1977), where it stated:

> Compulsory insurance laws are intended to protect the public at large who might otherwise suffer from being injured by uninsured motor vehicles. Compulsory insurance laws are not intended to protect other insurance companies. When the controversy is between two insurers, the liability for a loss should be determined by the terms and provisions of the respective policies without regard to the rights injured third parties might assert under a compulsory insurance law.

*See also Omni Ins. Co. v. Kentucky Farm Bureau Mut. Ins. Co.*, 999 S.W.2d 724, 726 (Ky. App. 1999); *State Farm Mut. Auto. Ins. Co. v. Register*, 583 S.W.2d 705, 706-07 (Ky. App. 1979); *but see Motorists Mut. Ins. Co. v. Grange Mut. Cas. Co.*, 149 S.W.3d 437, 441 (Ky. App. 2004) ("Unlike the escape clause at issue in Royal-Globe, the provision in Motorist Mutual's policy limiting coverage to

15

"bodily injury" clearly does not provide coverage for property damage as required by KRS 190.033."). However, we are compelled to our contrary position by our view of the legislative intent and spirit of the MVRA. Thus, to the extent inconsistent herewith, *Omni Ins. Co. v. Kentucky Farm Bureau Mut. Ins. Co.*, 999 S.W.2d 724, *State Farm Mut. Auto. Ins. Co. v. Register*, 583 S.W.2d 705, and *Royal Globe Ins. Companies v. Safeco Ins. Co. of America*, 560 S.W.2d 22, are overruled.

Admittedly, parties may contract for such coverage as they wish. And the terms of such policies "must control unless [they] contraven[e] public policy or a statute." *York v. Kentucky Farm Bureau Mut. Ins. Co.*, 156 S.W.3d 291, 294 (Ky. 2005) (*quoting Meyers v. Kentucky Medical Insurance Co.*, 982 S.W.2d 203, 209 (Ky. App.1997)). Yet, to be valid in respect of the MVRA, such contract, or clause thereof, must comply with its statutory scheme, including its intent and purposes. *See Bishop v. Allstate Ins. Co.*, 623 S.W.2d 865, 866 (Ky. 1981) ("Neither the drafters of the Uniform Act nor the writers of Kentucky's MVRA included sections permitting exclusions to the minimum required tort liability coverage.").

This is consistent with our pronouncement that "the MVRA is social legislation that must be liberally construed to accomplish [its] objectives." *Mitchell*, 244 S.W.3d at 63 (*quoting Nat'l Ins. Ass'n v. Peach*, 926 S.W.2d 859, 861 (Ky. App. 1996). And we have also noted that the intent and purpose of

16

the MVRA are to be broadly applied to accomplish its public policy purpose and thus "supercede general principles of insurance law as broadly applied." *Id.*

We glean from the legislative intent underlying the MVRA that the General Assembly intended, that in instances where both the vehicle owner and non-owner driver are separately insured, the vehicle owner's insurance shall be primary.

Since its inception in 1974, the MVRA has required every owner to procure insurance covering liability arising out of ownership of a motor vehicle. KRS 304.39-080.[8] The basic underlying premise is that in the event of an accident, the liable insurer will be readily identifiable and will promptly pay, up to its policy limits, for the injuries suffered. The MVRA does not gamble that a permissive driver *may* have insurance. *See* KRS 304.39-080(5) ("The owner of a motor vehicle who fails to maintain security on a motor vehicle in accordance with this subsection shall have his or her motor vehicle registration revoked in accordance with KRS 186A.040 and shall be subject to the penalties in KRS 304.99-060. An owner who permits another person to operate a motor vehicle without security on the motor vehicle as required by this subtitle shall be

_____

[8] We do note that KRS 304.39-080(5) was amended in 2007 to include the "or operator" language. However, this inclusion does not detract from our conclusion that the legislature, through the MVRA, intended to place the primary onus on the owner to secure the insurance on the vehicle, thus the vehicle would be insured whether the particular driver had separate insurance or not as the "or operator" language was only added in response to our decision in *Estes*, which refused to recognize criminal penalties for an operator of an motor vehicle uninsured by the owner, a fact we acknowledged in *Blakely*. *Estes v. Commonwealth*, 952 S.W.2d 701 (Ky. 1997); *Commonwealth v. Blakely*, 223 S.W.3d 107 (Ky. 2007). Thus, as we held in *Blakely*, the "or operator" language of KRS 304.39-080(5) does not undercut the underlying MVRA's policy that every vehicle operated be covered by insurance by its owner. *Cf. Blakely*, 223 S.W.3d at 109.

subject to the penalties in KRS 304.99-060."); *see also* KRS 304.39-080(1) ("The vehicle for which the security is so provided is the "secured vehicle.").

Moreover, we have previously stated that, "[b]y enacting the MVRA, the legislature intended to create a comprehensive compulsory insurance system that requires *owners* to provide vehicle security covering basic reparation benefits and that imposes legal liability on vehicle *owners* for damages or injuries arising out of *ownership* of or use of the vehicle." *McGrew v. Stone,* 998 S.W.2d 5 (Ky. 1999) (emphasis added). And in *McGrew,* given the strong mandates of the MVRA, we recognized a vehicle owner's liability for injuries resulting from the permissive use of her *uninsured* vehicle, a "new tort of no insurance" as described by Justice Cooper in his dissent. *Id.* at 7.

Finally, we find exceedingly inequitable the assertion that an insurance company can, under mandates of the MVRA, collect premiums from its insured while hiding behind an excess clause that purports to subvert its primary liability for that of another. *See Roth,* 269 So.2d at 6 (finding that the insurance company receiving the premium payment cannot escape primary liability).

Thus, under the mandates of the MVRA, our trial courts, under similar circumstances, will no longer be mired in the quagmire of which policy is primary. Moreover, the expedient resolution of this issue will streamline the process as each insurer's role is clearly defined, thus facilitating a simple

18

determination of which policy is primarily liable under these circumstances and hopefully without further drafting wars.

## IV. Conclusion

For the above reasons, we reverse the Court of Appeals' opinion and reinstate the summary judgment order of the Montgomery Circuit Court.

All sitting. Minton, C.J.; Abramson, Cunningham, Schroder, and Venters, JJ., concur. Noble, J., concurs in result only.

COUNSEL FOR APPELLANT:

Grover Carrington
Farrah Williams Ingram
White Peck Carrington, LLP
P.O. Box 950
Mount Sterling, KY 40353-0950

COUNSEL FOR APPELLEE:

James Wendell Taylor
Amanda Pope Thompson
Taylor, Thompson & Brannon, PLLC
2365 Harrodsburg Road
Suite A200
Lexington, KY 40504