RENDERED: AUGUST 25, 2016
TO BE PUBLISHED

𝔖upreme Court of 𝔎entucky FINAL

2014-SC-000265-DG

DATE 9/15/16 K. Redmon DC

COUNTRYWAY INSURANCE COMPANY

APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.            CASE NO. 2012-CA-002051-MR
WARREN CIRCUIT COURT NO. 10-CI-00689

UNITED FINANCIAL CASUALTY            APPELLEES
INSURANCE COMPANY AND
SHARON BARTLEY

**OPINION OF THE COURT BY JUSTICE HUGHES**

**REVERSING AND REMANDING**

This Court granted the motion for discretionary review by Countryway

Insurance Company, a New York corporation, in its dispute with United

Financial Casualty Company,[1] over how to apportion damages between the

two, both insurers having provided uninsured motorist (UM) coverage to a

passenger injured in an automobile accident in Bowling Green, Kentucky. In

light of what it deemed mutually repugnant "other insurance" clauses in the

---

[1] The record does not make clear where United Financial is registered and headquartered. The original complaint named Progressive Casualty Insurance Company, a Kentucky corporation, as the insurer of the accident vehicle, but during the pendency of the action before the Court of Appeals the parties jointly moved to "correct designation of appellee" by substituting United Financial for Progressive. The joint motion does not explain the relationship between the two companies. The Court of Appeals granted the motion whereby the appellee in that case came to be referred to as United Financial.

two policies, the Warren Circuit Court ordered the companies to share the damages *pro rata*, in proportion to their respective policy limits. Countryway appealed from that decision to the Court of Appeals, contending that the damages should not have been divided at all, but should have been apportioned entirely to United Financial, the insurer of the accident vehicle. To Countryway's dismay, the Court of Appeals panel decided that that argument was half right: the Court agreed that the damages should not have been divided, but in its view Countryway, the insurer of the injured passenger, bears primary, and in this case full, responsibility for the passenger's UM claim. We accepted review to consider the Court of Appeals panel's application of *Kentucky Farm Bureau Mut. Ins. Co. v. Shelter Mut. Ins. Co.*, 326 S.W.3d 803 (Ky. 2010) (*Shelter*), a case in which we addressed competing "other insurance" clauses in two auto insurance liability policies. The Court of Appeals departed somewhat from our approach in *Shelter* because of the different type of coverage—uninsured motorist (UM)—involved in this case. Convinced that the Court of Appeals needlessly distinguished the two types of coverage, we reverse the decision of the Court of Appeals and remand the matter to the Warren Circuit Court for entry of an appropriate order in favor of Countryway.

## RELEVANT FACTS

As is often the case in insurance apportionment contests, the pertinent facts are not in dispute and may be briefly stated. On about September 27, 2007, on Morgantown Road in Bowling Green, Sharon Bartley, a resident of Barren County, Kentucky, was riding as a passenger in a semi-tractor owned

2

and operated by her son, Joey Bartley. The semi-tractor was involved in a collision with a 1994 Pontiac Sunbird owned and operated by an uninsured driver, that driver's negligence being the sole cause of the collision. Sharon Bartley suffered significant injuries as a result of the accident.

Joey Bartley's semi-tractor was insured by United Financial. The United Financial policy included uninsured motorist coverage of $50,000 per person/$100,000 per accident. Sharon Bartley, as a "person occupying [the] insured auto," was an additional insured under that portion of the policy. Ms. Bartley's personal vehicle was insured by Countryway under a policy that also included uninsured motorist coverage, the limits of which were $100,000 per person/$300,000 per accident. As the family member and spouse of the policy's named insured, Sharon Bartley was an insured under this portion of Countryway's policy.

Although neither insurer denied that Bartley was an insured under its respective policy, both denied her claim for UM benefits on the ground that the other company's liability came first. As a result, Bartley brought suit in the Warren Circuit Court in April 2010 seeking, among other things, a declaration as to which carrier's coverage should apply. In June 2011, Countryway moved for a "determination of priority," and while that motion was pending, in December 2011 (more than four years after the accident), United Financial, without waiving its position in the priority dispute with Countryway, settled Bartley's claim for $22,500.

3

The UM provisions of both policies include "other insurance" clauses.

United Financial's policy provides as follows:

> If there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide shall be excess over any other uninsured or underinsured motorist coverage, except for **bodily injury** to **you** [the named insured] and, if the named insured is a natural person, a **relative** when **occupying** an **insured auto** or **temporary substitute auto.**

(emphasis in original) The policy defines a "relative" as "any person living in the household in which the named insured resides who is related to the named insured by blood, marriage, or adoption, including a ward or foster child." Sharon Bartley was not a named insured on her son's policy, and, since she did not reside with her son, she was not his "relative" either, for policy purposes. United Financial thus insisted that the UM coverage provided to Bartley as a vehicle occupant was excess over other UM coverage.

> The Countryway policy's "other insurance" clause provides that
>
> [i]f there is other applicable insurance similar to the insurance provided by this endorsement, we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance similar to the insurance provided by this endorsement.

Since Bartley was injured while a passenger in a vehicle she did not own, Countryway's UM coverage was thus also "excess" according to the policy.

Coverage under both policies being "excess," United Financial argued before the trial court that the rule of "mutual repugnance" applied. Under that

4

rule, competing excess clauses, such as these appear to be, effectively nullify each other, leaving the two companies co-insurers with the obligation to provide *pro rata* coverage with respect to any remaining liability up to the policy limits. *Progressive Northern Ins. Co. v. Conner,* 2006 WL 318819 (E.D. Ky. 2006) (applying this rule in a similar case involving a claim for underinsured motorist benefits and citing *Hamilton Mut. Ins. Co. v. U.S. Fid. & Guar. Co.,* 926 S.W.2d 466 (Ky. App. 1996)).

Countryway argued against the *pro rata* result on the ground that United Financial's attempt to limit its coverage of certain occupants of the insured vehicle to excess coverage was contrary to an established practice in Kentucky whereby vehicle insurers provided primary coverage to all vehicle occupants. That practice is purportedly reflected in *American Auto. Ins. Co. v. Bartlett,* 560 S.W.2d 6 (Ky. 1977); *Hamilton Mut. Ins. Co., supra;* and *Metcalf v. State Farm Mut. Auto Ins. Co.,* 944 S.W.2d 151 (Ky. App. 1997).

United Financial's denial of primary coverage to an insured vehicle occupant was also contrary, Countryway maintained, to this Court's then recent decision in *Shelter, supra,* in which we discerned in the Motor Vehicle Reparations Act (MVRA), Kentucky Revised Statute (KRS) Chapter 304, Subchapter 39, a strong legislative policy favoring the expeditious settlement of auto injury liability claims. That policy was being frustrated, the Court explained in *Shelter,* by insurance company efforts to avoid primary coverage in favor of excess coverage. To curtail those efforts, at least in the context of auto *liability* insurance, the Court held that, notwithstanding an "other insurance"

clause, the insurer of the accident vehicle has primary responsibility for liability coverage to the extent of its policy limits. Similarly, Countryway argued, the accident vehicle insurer should be deemed primarily liable to injured vehicle occupants for UM benefits. The trial court rejected these arguments by Countryway and agreed with United Financial that the insurers' competing excess provisions essentially cancelled each other, leaving the companies liable for Bartley's damages on a *pro rata* basis.

Countryway, as noted above, appealed from that decision to the Court of Appeals. That Court agreed with Countryway that the concerns this Court expressed in *Shelter,* concerns about frequent, lengthy apportionment disputes clogging the arteries of the accident-victim compensation process, applied no less to UM-based compensation claims than they did to liability-based claims. Accordingly, the panel concluded, "[a]bolishing the rule of apportionment for UM coverage is a logical and natural extension of *Shelter.* It will undoubtedly lead to quicker payment to injured victims of uninsured motorists, cut down on the battle of the forms, and reduce litigation." *Countryway Ins. Co. v. United Fin. Cas. Co.,* No. 2012-CA-002051-MR, p. 13 (January 24, 2014).

In the panel's view, however, indemnity insurance (so-called first-party insurance), such as UM coverage, is unlike the liability insurance at issue in *Shelter* (so-called third-party insurance), in that indemnity insurance is "personal to the insured," and has been said to "follow the person, not the vehicle." The Court rejected, therefore, the *Shelter* rule fixing primary liability coverage on the insurer of the accident vehicle, and held that primary UM

6

coverage would be fixed instead on the "UM policy covering the injured person, in this case, Countryway's policy." *Countryway v. United Fin.*, pp. 15-16.

It is this latter determination making the accident victim's insurer primarily liable for UM compensation, rather than the accident vehicle's insurer, that Countryway contests and has asked us to review. As Countryway sees it, this part of the Court of Appeals' decision is both wrong and unauthorized. It is wrong because it ignores a general rule, a rule at least latent in our case law, which places primary UM liability on the insurer of the owner of the vehicle involved. And it is unauthorized because it goes beyond the questions asked by Countryway's appeal—did the trial court err by finding both UM coverages excess and pro rating the liability instead of deeming United Financial the primary insurer?—to address a different question—should Countryway be deemed the primary insurer?—that United Financial could have, but did not, ask by way of cross-appeal. *Fischer v. Fischer*, 348 S.W.3d 582, 594 (Ky. 2011) (citing *Brown v. Barkley*, 628 S.W.2d 616 (Ky. 1982), concerning necessity of cross-appeal); and *cf. Greenlaw v. United States*, 554 U.S. 237, 244-45 (2008) (noting rule in federal courts that "it takes a cross-appeal to justify a remedy in favor of an appellee."). Because we agree with Countryway that the Court of Appeals erred by fixing primary liability for UM coverage on the accident victim's insurer instead of on the insurer of the accident vehicle, we need not address Countryway's latter, alternative ground for relief.

7

## ANALYSIS

Automobile insurance policies are contracts, and of course, generally the contract's terms (including apportionment provisions) are to be enforced as intended and reasonably understood by the parties unless such terms are prohibited by statute or violate a clearly established public policy. *York v. Ky. Farm Bureau Mut. Ins. Co.,* 156 S.W.3d 291, 294 (Ky. 2005) ("The terms of an insurance contract must control unless [they] contravene public policy or a statute.") (citation and internal quotation marks omitted); *Marcum v. Rice,* 987 S.W.2d 789 (Ky. 1999). For the most part, moreover, while the General Assembly has mandated certain automobile insurance coverages, it has not expressly addressed whether a particular coverage is to be deemed primary. The major exception to that silence is KRS 304.39-050(1) providing in pertinent part (emphasis supplied) that "[t]he basic reparation insurance applicable to bodily injury to which this subtitle applies is the *security covering the vehicle occupied by the injured person at the time of the accident.*" Also to be noted, although not a directive, KRS 304.39-110(2) provides in part (emphasis again supplied) that "[s]ubject to the provisions on approval of terms and forms, *the requirement of security for payment of tort liabilities may be met by a contract the coverage of which is secondary or excess to other applicable valid and collectible liability insurance.*" This provision certainly allows for liability policies with "other insurance" clauses and, at least prior to *Shelter,* may have been thought to authorize, or even require, courts to "referee the battle of the draftsmen" in the event of dueling excess clauses. 326 S.W.3d at 808.

8

The general rule favoring freedom of contract and the statutory allowance of secondary liability coverage must be understood, however, in conjunction with the fact that auto insurance is a business subject to extensive regulation under the MVRA and other portions of the insurance code, and one deeply pervaded by the MVRA's basic purpose of improving, simplifying, and streamlining Kentucky's auto-accident reparations system. *Mitchell v. Allstate Ins. Co.,* 244 S.W.3d 59 (Ky. 2008). That fundamental purpose trumped contract considerations, we held in *Shelter,* where a priority dispute between the vehicle's and the permissive driver's liability insurers raised the specter of uncertainty and delay at the expense of an accident victim in need of reparations.

As we were in *Shelter,* therefore, we are again confronted by two questions. First, should the contracts be the focus of analysis and their "other insurance" clauses be given effect to the extent possible, as was the approach of the trial court;[2] or is the "battle of the forms" with respect to UM apportionment in this case as out of keeping with statutory goals and purposes as we held it was in *Shelter* with respect to liability apportionment, so as to require, as the Court of Appeals held, that the insurers' UM "other insurance" provisions be disregarded in favor of a more bright-line rule? Second, if there

---

[2] The trial court's approach was that of a (large) majority of other jurisdictions. A. S. Klein, *Uninsured motorist insurance: validity and construction of "other insurance provisions,* 28 A.L.R.3d 551 (1969, updated weekly); Scott M. Seaman and Jason R. Schulze, *Allocation of Losses in Complex Insurance Coverage Claims,* Chapter 5. Reallocation among Insurers Through "Other Insurance" Clauses, § 5:4 (2015) (providing numerous citations to cases illustrating the various permutations of competing "other insurance" clauses).

is to be a rule, on whom is it to fall: the insurer of the vehicle, as we held in *Shelter* was appropriate as between vehicle and permissive-driver liability insurers, or on the passenger's insurer, as the Court of Appeals deemed appropriate in the UM context? Because these questions involve only issues of law, whether contract construction or statutory interpretation, our standard of review is *de novo*: while we appreciate and have benefited from the thoughtful analyses of the courts below, we review them without deference. *Dowell v. Safe Auto Ins. Co.*, 208 S.W.3d 872, 875 (Ky. 2006).

## I. The Competing "Other Insurance" Clauses Should Be Disregarded.

Turning first, then, to the question of whether the "other insurance" clauses of the two policies need be grappled with (trial court) or should be disregarded (Court of Appeals), we agree with the Court of Appeals that there is no meaningful distinction between the clauses at issue here and those deemed at odds with the MVRA statutory intent in *Shelter*. In both cases the "other insurance" provisions were designed to narrow the insurer's primary coverage and to broaden the circumstances in which its coverage would be excess. In *Shelter*, we noted how at odds with the mandates of the MVRA is an insurer's practice of collecting a primary-coverage premium "while hiding behind an excess clause that purports to subvert its primary liability for that of another." *Shelter*, 326 S.W.3d at 812. Similar concerns have led other courts to interpret their state's compulsory coverage statutes as placing primary responsibility for liability or UIM coverage on the vehicle owner's insurer. *Bowers v. Alamo Rent-A-Car, Inc.*, 965 P.2d 1274, 1277-81 (Haw. 1998) (liability); *State Farm Mut.*

10

*Auto. Ins. Co. v. Clarendon Nat'l Ins. Co.*, 604 A.2d 384, 387-90 (Del. 1992) (liability); *State Farm Mut. Auto. Ins. Co. v. Enterprise Leasing Co.*, 549 N.W.2d 345 (Mich. 1996) (liability); *State Farm Mut. Auto. Ins. Co. v. Safeco Ins. Co.*, 298 P.3d 452 (N.M. 2013) (citing, *Branchal v. Safeco Ins. Co. of America*, 738 P.2d 1315, 1316 (N.M. 1987) (UIM)).

We also discussed at length in *Shelter* the burden on courts, trial courts especially, of having continually to construe such "other insurance" clauses as they evolve in response to competitors and to court rulings, and we observed the difficulty of providing a satisfactory remedy in the (not infrequent) event that the clauses negate each other so that neither can be enforced. 326 S.W.3d at 807-811.[3] Those difficulties are no less present in the UM context than they are in the context of liability coverage.

---

[3] The problem of coordinating concurrent insurance coverage is by no means new. By the middle of the twentieth century, with insurance coverages proliferating, courts and commentators had become familiar with the conundrums posed by competing "other insurance" provisions. Note, *Concurrent Coverage in Automobile Liability Insurance*, 65 Colum. L. Rev. 319 (1965) (Note). Because such provisions frequently apply only when there is "other valid and applicable coverage," one problem that often arises with competing provisions is that one cannot tell whether provision A applies without knowing whether provision B applies, but likewise provision B's applicability depends on provision A's. As early as 1959, intractable problems such as this led the Supreme Court of Oregon simply to disregard competing "other insurance" clauses and to pro rate the affected coverages. *Lamb-Weston, Inc. v. Oregon Auto. Ins. Co.*, 341 P.2d 110 (Ore. 1959) (citing *Oregon Auto. Ins. Co. v. United States Fid. & Guar. Co.*, 195 F.2d 958 (9th Cir. 1952)). While the so-called Oregon rule has been criticized for riding rough shod over the parties' rights to contract, it has also attracted a fair number of followers. Hasse, *Is There a Solution to the Circular Riddle? The Effect of "Other Insurance" Clauses on the Public, the Courts, and the Insurance Industry*, 25 S.D. L. Rev. 37 (1980); Marcy Louise Kahn, *The 'Other Insurance' Clause*, 19 Forum 591 (1984); Susan Randall, *Coordinating Liability Insurance*, 1995 Wis. L. Rev. 1339 (1995) (Randall) (recognizing the problem inherent in applying a contract approach to priority disputes between insurers that do not have a contractual relationship). Despite this long-standing and widespread dissatisfaction with the policy-by-policy approach to the problem of concurrent coverages, it is a problem that thus far has

11

In both *Shelter* and this case, moreover, the insurers' competing efforts to shift primary liability led to litigation between them, and while in *Shelter* that litigation apparently did not delay the accident victim's compensation, here it appears to have done so—Bartley waited four years for compensation to which both insurers agreed from the outset she was entitled. As we noted in *Shelter*, such delay is clearly at odds with the MVRA's basic purpose of assuring prompt victim reparation, and just as clearly it is a likely occurrence when there is a priority dispute given dueling "other insurance" clauses.

Notwithstanding this sort of negative effect on the "quality" of mandatory insurance coverage, several courts have held that because, ultimately, they do not affect the "quantity" of coverage, "other insurance" apportionment clauses do not contravene the public policy embodied in motor vehicle compensation statutes. As those courts see them, "provisions that merely establish the priority of coverage among insurers" do not compromise coverage for insureds. *State Farm Mut. Auto Ins. Co. v. Powers*, 732 A.2d 730, 734 (Vt. 1999) (citing cases); *Shelter Mut. Ins. Co. v. Mid-Century Ins. Co.*, 246 P.3d 651, 659 (Colo. 2011) ("[T]he excess clause cannot properly be considered a reduction in coverage.").

---

been left to the courts and, not surprisingly absent industry or legislative direction, has defied general solution. Douglas R. Richmond, *Issues and Problems in "Other Insurance," Multiple Insurance, and Self-Insurance*, 22 Pepp. L. Rev. 1373 (1995); J. Stephen Berry, Jerry B. McNally, *Allocation of Insurance Coverage: Prevailing Theories and Practical Applications*, 42 Tort Trial & Ins. Prac. L. J. 999 (2007).

12

As we explained in *Shelter*, however, under our statutory scheme, injured insureds are entitled not just to compensation someday, but to prompt payment without "the uncertainty and potential delays of the litigation necessary to establish—and re-establish—the priority and coverage from which reparations are to be made." *Shelter*, 326 S.W.3d at 807. Even when deciding against the course we took in *Shelter* and attempting to give effect to "other insurance" clauses, other courts have recognized this dilemma. The Supreme Court of Colorado put the lament this way:

> We are aware that because our decision today gives insurers greater license to use other-insurance clauses, insurers may increasingly turn to the courts to resolve conflicts between more frequently used and sophisticated other-insurance clauses; this is not desirable for several reasons, the principal one being that other-insurance disputes may frustrate the prompt payment of claims to insureds.

*Shelter v. Mid-Century*, 246 P.3d at 664 (citing *Schoenecker v. Haines*, 277 N.W.2d 782, 786-87 (Wis. 1979), and *Hindson v. Allstate Ins. Co.*, 694 A.2d 682, 685-86 (R.I. 1997)).

This case illustrates the importance of that point, and makes clear that our reasons in *Shelter* for "declin[ing] . . . to further embroil Kentucky courts in unduly complicated two-step insurance policy interpretations of continually emerging and changing insurance avoidance clauses," 326 S.W.3d at 805, apply just as much to priority disputes between vehicle and passenger insurers in UM cases as to similar disputes between vehicle and permissive-driver insurers in liability cases. We agree with the Court of Appeals, accordingly, that between such insurers, "[a]bolishing the rule of apportionment for UM

13

coverage is a logical and natural extension of *Shelter*." *Countryway v. United Financial, supra.*

## II. The Vehicle Owner's Insurer Bears Primary Responsibility For UM Coverage.

Turning then to the second question this case raises—*i.e.,* having determined that a bright line rule of primary coverage is appropriate, upon which insurer should that responsibility fall?—we do not agree with the Court of Appeals that differences between the liability insurance at issue in *Shelter* and the indemnity (UM) insurance at issue here require that primary responsibility for UM coverage be assigned to the injured passenger's insurer and not, as in *Shelter,* to the insurer of the accident vehicle. In insisting that, unlike third-party liability coverage, first-party UM coverage is "personal" to the insured, the Court of Appeals appears to have conflated the distinction between liability and indemnity insurance, on the one hand, and that between insureds of the first class—in personal policies, often the named insured and the named insured's resident family members—and insureds of the second class—persons covered only because of their use of or otherwise close involvement with the covered vehicle.

As this Court noted in *Ohio Cas. Ins. Co. v. Stanfield,* 581 S.W.2d 555, 557 (Ky. 1979), a UM stacking case, "[t]he protection afforded the first class is broad. Insureds of the first class are protected regardless of their location or activity from damages caused by injury inflicted by uninsured motorists." 581 S.W.2d at 557. See KRS 304.20-020, "Uninsured vehicle coverage." As *Shelter* illustrates, of course, a first-class insured's liability coverage is likewise

14

"personal" in this sense, following him or her as a permissive operator of another owner's vehicle. And so too a first-class insured's UIM coverage applies to the insured's use, as a passenger, say, of non-owned vehicles. *James v. James,* 25 S.W.3d 110 (Ky. 2000).

"As to the second class of insureds, however, . . . it is clear that their protection is confined to . . . [claims arising] while they are 'occupying an insured . . . vehicle.'" *Stanfield,* 581 S.W.2d at 557. *See also, Shelter* and *James.*[4]

Thus, in *Dupin v. Adkins,* 17 S.W.3d 538 (Ky. App. 2000), a case the Court of Appeals panel relied on in making its purported distinction between the liability coverage at issue in *Shelter* and the "personal" indemnity coverage at issue here, the Court did indeed note that the UIM coverage at issue in that case was "personal" to the insured, but it was so not because it was indemnity insurance as opposed to liability insurance, it was "personal" rather because the claimant was a named, premium-paying insured claiming under his own policy, *i.e.,* an insured of the first/class. The *Dupin* Court rejected, as inconsistent with the UIM statute, an insurance company contention that insureds of the first class, like those of the second, were only covered when injured while occupying one of the insured's covered vehicles. *Dupin* did not

---

[4] And see Note, *supra,* at 319-20, explaining that concurrent coverage issues commonly arise where, as in this case, a non-owner has used another's vehicle and coverage is provided by both an "omnibus" clause in the vehicle owner's policy, providing coverage, whether liability or indemnity, to anyone—second-class insureds—using the described automobile with permission of the named insured, and a "use other car" clause in the claimant's own policy—first-class insured.

15

address a concurrent-coverage priority issue, or suggest in any way how such an issue might be decided, much less that it should be decided at the expense of the injured person's "personal" insurer. We reject, therefore, the Court of Appeals panel's distinction between indemnity coverage and liability coverage and its conclusion that because the former is "personal" to the insured (the latter is just as "personal" for first-class insureds), a priority dispute between the "personal" insurer and the vehicle owner's insurer should henceforth be resolved against the injured person's own insurer.

In *Shelter,* we held that the liability coverage a vehicle owner's policy extended to permissive drivers should be deemed primary vis-à-vis the driver's policy's "non-owned vehicle" coverage. That holding, we explained, was in accord with the MVRA's requirement that every vehicle owner procure liability insurance covering use of the vehicle, and with the General Assembly's express intent that the MVRA provide a system wherein, "in the event of an accident, the liable insurer will be readily identifiable and will promptly pay, up to its policy limits, for the injuries suffered." *Shelter,* 326 S.W.3d, at 811. *Cf. Bowers v. Alamo Rent-A-Car, Inc., supra; State Farm Mut. Auto. Ins. Co. v. Clarendon Nat'l Ins. Co., supra;* and *State Farm Mut. Auto. Ins. Co. v. Enterprise Leasing Co., supra* (all holding that statutes requiring vehicle owners to obtain liability insurance coverage for permissive users of their vehicles implicitly required that such coverage be primary notwithstanding policy provisions attempting to shift primary responsibility to the insurer of the permissive user). The General Assembly's apparent intent, we also noted, was in keeping with a

16

"'general rule which places primary liability on the insurer of the owner of the automobile involved rather than on the insurer of the operator, where we are dealing with the standard automobile liability policy.'" *Shelter,* 326 S.W.3d at 810 (quoting *U.S. Fid. & Guar. Co. v. Safeco Ins. Co. of America,* 522 S.W.2d 809, 821 (Mo. 1975)).

Relying on *American Auto. Ins. Co. v. Bartlett,* 560 S.W.2d 6 (Ky. 1977), *Metcalf v. State Farm Mut. Auto. Ins. Co.,* 944 S.W.2d 151 (Ky. App. 1997), and *Hamilton Mut. Ins. Co. v. United States Fid. & Guar. Co.,* 926 S.W.2d 466 (Ky. App. 1996), Countryway contends that under Kentucky law a similar "general rule" also places primary liability on the insurer of the accident vehicle with respect to UM coverage. Indeed, high courts in other states have recognized the "rule" that "the insurer of a vehicle involved in a collision has primary UIM [or UM] coverage for the passengers of that vehicle, while the insurer of a passenger in that vehicle has excess coverage for that passenger." *Elrod v. General Cas. Co. of Wisconsin,* 566 N.W.2d 482, 486 (S.D. 1997) (citing cases and treatises). This "rule," however, is not, as Countryway would have it, a constraint on insurance practice (Countryway does not tell us whence such a constraint would arise), but is an acknowledgment rather of what that practice very often was and is. A great many automobile insurance policies, liability policies as well as those providing UM or UIM coverage (such as Countryway's UM policy in this case, for example), extend *primary* coverage, through some sort of omnibus provision, to permissive users or occupants of the covered vehicle, and *excess* coverage, through some sort of "non-owned-vehicle" "other

17

insurance" clause, to named insureds operating or using the vehicles of others. Where two such policies compete, the vehicle owner's policy is regularly held to provide—by its terms—the primary coverage. Randall, 1995 Wis. L. Rev., at 1376-77 (offering an underwriting account of this "standard auto policy").

The trilogy of cases to which Countryway refers us illustrates this "rule," for in each of these cases persons injured while occupying non-owned vehicles were found to have primary UM (or UIM) coverage by virtue of a provision providing for such in the vehicle owner's policy,[5] and excess UM coverage through the non-owned vehicle provisions of their own policies. Those cases do not say, however, that auto insurance policies may never deviate from that common pattern, and when they do the "general rule" does not, at least not by itself, provide much guidance. *Shelter Mut. Ins. Co. v. American Family Mut. Ins. Co.,* 210 S.W.3d 338, 341 (Mo. App. 2006) (noting that the "general rule" referred to in *United States Fid. & Guar. Co. v. Safeco Ins. Co., supra,* of primary liability coverage falling on the vehicle owner does not apply where the policy at issue is "not standard" and "avoids the general rule"). United Financial's policy here, of course, is not "standard" in that, by its terms at least, it does not provide primary coverage to all permissive users of the covered vehicle, but purports, rather, to limit primary coverage to named insureds and to provide other permissive users of the vehicle excess coverage only.

---

[5] In *Bartlett,* to be sure, the Court presumed the vehicle owner's policy provided primary coverage, but it did so, it appears, because that policy had not been made a part of the record and the presumption was appropriate in light of the parties' positions and burdens of proof.

We made reference to the (liability coverage) "general rule" in *Shelter,* not so much as a rule of law dictating the outcome, but rather as a "rule" of insurance practice that shed valuable light on the General Assembly's likely intent in making vehicle owners responsible for providing liability coverage, not only for themselves, but also for others who use the covered vehicle with permission. Given the MVRA's insistence that vehicle owners provide liability coverage for the use of their vehicles, and its emphatic aim that that coverage be effective at providing assistance to persons injured by automobiles, we had little trouble viewing with scepticism "other insurance" clauses departing from the "general rule" by attempting to shift primary coverage to permissive drivers. Such "other insurance" clauses complicate and delay the determination of primary coverage, and thus impair, or at least threaten, the effectiveness of the mandated coverage contrary to the "simpler [and less litigious] is better" spirit and intent of the MVRA. *Shelter,* 326 S.W.3d at 810 (citing *Mitchell v. Allstate Ins. Co.,* 244 S.W.3d at 63).

In attempting to discern whether a similar legislative intent informs the UM statutory provisions, our attention is drawn initially to some apparent differences in the two statutory schemes. For one, vehicle owners are not required to obtain UM coverage as they are required to maintain liability coverage. UM coverage is strongly encouraged, however, for it must be offered to vehicle owners in conjunction with the mandatory liability coverage, and UM coverage will be deemed included in the contract unless rejected in writing by

19

the owner.[6] *Meridian Mut. Ins. Co. v. Siddons,* 451 S.W.2d 831 (Ky. 1970) (holding that implied UM coverage in a liability policy that did not mention it was available for stacking).

Another seeming difference between the two statutes, is that the UM statute, which appears in subchapter 20 of the Insurance Code (the "casualty insurance contracts" subchapter), is not technically a part of the MVRA— subchapter 39—and so not directly within the MVRA's declarations of purpose, which figured so prominently in *Shelter.* This difference, however, reflects historical accident rather than legislative intent,[7] and we have observed that no less than its MVRA sibling, the UIM statute (KRS 304.39-320), the UM statute must be construed in light of and in accord with the MVRA. *State Farm Mut. Auto. Ins. Co. v. Fletcher,* 578 S.W.2d 41, 43 (Ky. 1979) (explaining that UM and MVRA provisions "are in *pari materia* and must be harmonized"); *Coots v. Allstate Ins. Co.,* 853 S.W.2d 895, 898 (Ky. 1993) (noting that UM and UIM coverages serve, basically, "the same purpose and follow[] the same pattern").

---

[6] KRS 304.20-020 provides in pertinent part that "[n]o automobile liability or motor vehicle liability policy of insurance insuring against loss resulting from liability . . . shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, . . . for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; provided that the named insured shall have the right to reject in writing such coverage."

[7] *See* Cooper, *Uninsured Motorist Coverage—Charting the Kentucky Course,* 62 Ky. L. J. 467 (1973-74), and Note, *Kentucky No-Fault: An Analysis and Interpretation,* 65 Ky. L. J. 466 (1976-77), for accounts of the statutory beginnings.

We are left, then, with the close conjunction of insurer-mandated UM coverage and insurer-and owner-mandated liability coverage. This conjunction readily suggests a legislative awareness of the "general rule" whereby the vehicle owner's primary responsibility for liability coverage is coupled with an understanding that his or her provision of UM coverage will also be primary. It may well be that the General Assembly did not initially envision this "general rule" as an actual rule. *Cf.* KRS 304.39-110 (1974) (providing that secondary coverage could satisfy some coverage requirements). As we indicated in *Shelter*, however, given the increasing demise of the "general rule" as an industry standard, and given the proliferation of "other insurance" clauses and the inevitable litigation they spawn, any contrary result runs directly counter to the MVRA's basic purposes of minimizing insurance litigation and "encourag[ing] . . . prompt payment of needed medical care and rehabilitation" to accident victims. KRS 304.39-010(3). As in *Shelter*, therefore, we find in the stated purposes of the MVRA a legislative intent to the effect that in instances where both the vehicle owner and a non-owner passenger are separately insured with UM coverage, the vehicle owner's coverage shall be primary.

**CONCLUSION**

In sum, in *Shelter* we departed from the approach of most courts when confronted by an "other insurance" priority dispute between liability carriers for the owner of the accident vehicle and for a permissive driver. We found implicit in the MVRA both a rejection of the increasingly byzantine litigation such disputes require and a fixing of primary coverage on the insurer of the vehicle.

21

Given *Shelter's* departure from the norm, the trial court and the Court of Appeals in this case had the unenviable task of trying to choose between norm and departure therefrom in a slightly different priority dispute context. Neither court's choice quite comports with what we believe the MVRA requires. In our view, much as in *Shelter,* the MVRA generally obviates priority disputes between the UM insurers of the vehicle and an injured passenger by implicitly fixing primary UM coverage on the vehicle's insurer. Accordingly, we reverse the decision of the Court of Appeals and remand the matter to the Warren Circuit Court for entry of an order consistent with this Opinion and granting Countryway's motion for a determination that United Financial has primary coverage of Sharon Bartley's uninsured motorist claim.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Brian Keith Pack
Herbert, Herbert & Pack

COUNSEL FOR APPELLEE
UNITED FINANCIAL CASUALTY
INSURANCE COMPANY:

Tracey C. Smith
Gwin Steinmetz & Baird PLLC

COUNSEL FOR APPELLEE
SHARON BARTLEY:

Brian M. P. Driver
Rogers & Driver, LLP